Craig H. Durham
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, Idaho 83702
Telephone: (208) 724-2617
Facsimile: (208) 906-8663
chd@fergusondurham.com
ISB No. 6428

Attorney for Petitioner

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ELDON GALE SAMUEL, III, | Case No. 2:20-CV-545-REP |
| Petitioner, | |
| v. | **PETITIONER'S REPLY TO RESPONDENT'S ANSWER** |
| TEREMA CARLIN, Warden of the Idaho Correctional Institution – Orofino, | |
| Respondent. | |

## INTRODUCTION

Eldon Samuel, now 22-years-old, has been in state custody on an adult charge since he was a 14-year-old eighth-grader. At that young age, after years of parental abuse and neglect, he shot and killed his father in the tiny rental home that they shared in Coeur d'Alene. He also killed his younger brother during the same episode. The State charged him with

second-degree murder in his father's death and first-degree murder for the death of his

brother. At trial, he claimed self-defense as to his father and argued that he had killed

his brother in a sudden rage, which would have been manslaughter, not murder. He

was convicted as charged.

The State used Samuel's incriminating statements against him, which he had

given to police officers during a custodial interrogation shortly after his arrest. The

Idaho Supreme Court turned aside Samuel's argument that – due to his young age,

immaturity, unstable background, and other unique factors – he had not knowingly and

voluntarily waived his right to counsel and his right against self-incrimination before

police questioned him (a *Miranda* violation). The state court further denied his claim

that even if the State could prove that he had waived his *Miranda* rights, his statements

were still involuntary, and their use at trial violated his rights under the Due Process

Clause of the Fourteenth Amendment.

Samuel claims that the state court's adjudication of these constitutional claims

was unreasonable and that he is entitled to habeas relief. A case with materially similar

facts, *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011), strongly supports his claim, as

discussed below.

# BACKGROUND

It is an understatement to say that by the time Eldon Samuel was a young teenager, he had lived a transitory and unstable life:

> Samuel was born in California in 1999. Samuel's parents had another son eleven months after Samuel was born. Samuel's younger brother was severely autistic and required significant attention. Both of Samuel's parents had prescription drug addictions which led to financial problems, criminal charges, and arrests. Throughout Samuel's childhood the family lived in shoddy, cockroach-infested residences and moved frequently, usually after they had been evicted for not paying rent. Samuel's mother started abusing pain pills following a car accident when Samuel was 4, became suicidal, and was hospitalized several times. Samuel's father became addicted to pain pills after he injured his shoulder at work. Samuel's father began to believe that a "zombie apocalypse" was inevitable. Samuel's mother testified that Samuel's father taught him how to kill zombies by playing violent video games, watching zombie-themed movies, and training Samuel to use knives and guns.

> Samuel witnessed extreme violence growing up. When Samuel was four he watched his father pour lighter fluid on his mother and threaten to burn her alive because he wanted a settlement check she received from a car accident. When Samuel was six he watched his father intentionally drive over his mother, breaking her collar bone. When Samuel was ten his father pointed a gun at his mother's head, bound her with duct tape, and forced Samuel to urinate on her. Child Protective Services were repeatedly contacted in California but never intervened. By 2013, Samuel's mother had left and Samuel's father moved to Idaho with Samuel and his brother. Samuel had frequent visits to the doctor for insomnia, nausea, migraines, blurred vision, and congestion.

*State v. Samuel*, 452 P.3d 768, 775 (Idaho 2019) (State's Lodging B-4, p. 1.)

Around 9:00 p.m. on March 24, 2014, Samuel called 911 to report that his father and his brother had been shot. *Samuel*, 452 P.3d at 775. Officers arrived at the Samuels' small rental home in Coeur d'Alene, where they arrested Eldon. *Id*. They cuffed him,

ordered him around, and then stuck him in the back of a patrol car. (State's Lodging A-6, pp. 147-48.) He was in custody at the scene and in the patrol car for about 30 minutes before arriving at the police station. (*Id*. at 148.)

Officers put Samuel, who weighed just over 100 pounds and stood about 5'2" tall, in a small interrogation room. There, in the presence of at least three adult male police officers, the boy was ordered to strip naked, one piece of clothing at a time, while the officers took pictures to preserve evidence for about 35-40 minutes. *Samuel*, 452 at 782. They also swabbed parts of his body. *Id*. When they gave him jail-issued clothing, they did not give him socks or underwear despite his repeated requests. *Id*. He had slept only about two hours the previous night, *see* State's Lodging A-3, 58:15 – 58:40, which he said was "good enough" because he "takes medication." *Samuel*, 452 P.3d at 782. He had last eaten a few hotdogs around noon, almost 12 hours earlier. *Id*.

The lead interviewer was the school resource officer at Samuel's middle school, Detective Wilhelm. 452 P.3d at 782. Sergeant McCormick also tagged-teamed questions during the interview. *Id*. Samuel could not remember his phone number or his address. *Id*. When Wilhelm asked him if he was experiencing any discomfort, he replied that he "always hurts all over." *Id*.

Wilhelm then gave Samuel a form to waive his *Miranda* rights, which he explained to Samuel as follows:

> Detective Wilhelm: Alright. Well, if you're okay let's get down to why-why
> we're here to talk today. Is that okay with you?

Samuel: Yeah.

Detective Wilhelm: I'm gonna scoot forward a little bit so I can go over this with you, okay?

Samuel: Okay.

Detective Wilhelm: We didn't go over this in the office, but 99% of the kiddos in my office we give them this warning because sometimes we talk to the parents about what we're gonna talk about and sometimes we won't. Okay? So, I've actually got two of these, so I'm gonna give you that, and then I've got one and I'm gonna explain it to you, okay? So this is a – I've got one for you too, sir.

Sergeant McCormick: Thanks.

Detective Wilhelm: This is a *Miranda* warning. You know how you see on TV, you see like these cop shows? They're just TV shows. Let me tell ya, they're made up. But they slam guys against the car.

Samuel: (Nods head yes).

Detective Wilhelm: They're slamming them up against the car and then they read these rights to them. And it's kind of at the same time, sometimes they slam up against the car, put them in jail, then they read his rights. And so that's not anything like this. Alright.

Samuel: (Nods head yes).

Detective Wilhelm: These are just some rights that everyone is entitled to. Like if I were to talk to my boss or, um, someone that came to my house and said, "Man, I need to talk to you about this." I probably wouldn't but I could pull out these Miranda rights and, "You know what, Officer Joe, I don't want to talk to you and this is why." Okay? Does that make sense?

Samuel: Yeah. (Nods head yes).

Detective Wilhelm: Okay, so I'm gonna read them to ya, and I'll just read them in order, okay? This is [sic] Miranda warning. It says first you have

the right to remain silent. Number two. Anything you say can and will be used against you in a court of law. Third. You have the right to talk to a lawyer and have them present with you while you're being questioned. Good so far?

Samuel: (Nods head yes) Um-hum.

Detective Wilhelm: Okay. So fourth [sic]. If you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish on [sic]. So in full print there it says – you're a smart guy. So do you understand each of these rights as I've explained them to you?

Samuel: (Nods head yes).

Detective Wilhelm: Do you understand those rights?

Samuel: Um-hum.

Detective Wilhelm: One through four?

Samuel: Um-hum.

Detective Wilhelm: Okay. Would you mind signing right there?

Samuel: (Grabs pen)

Detective Wilhelm: You sure?

Samuel: Yeah.

Detective Wilhelm: Eldon, can you circle yes for me too, if you don't mind?

Samuel: Yes.

Detective Wilhelm: I didn't know you were a lefty.

Samuel: A lefty?

Detective Wilhelm: Yeah. Did you have left handed handcuffs? I'm just teasing you.

Sergeant McCormick: (Laughs)

Samuel: I screwed up.

Detective Wilhelm: I messed you up didn't I? Go ahead and sign. I'm sorry, I'll keep my mouth shut. Can you do me another favor? How about on the date? Can you date it for me? It is still 3/24/14 or it's March 24th 2014, however you wanna write.

Samuel: 3/24?

Detective Wilhelm: 14. 2014.

Samuel: (Signing paper).

Detective Wilhelm: Okay. So hang on to that for just a second okay. Now, that was the tough part. So you said that you understood each of those rights ...

Samuel: ... yeah ...

Detective Wilhelm: ... as I explained them to you, okay? It's because I did such a great job. Secondly, this, it says having these rights in mind, do you wish to talk to us right now? Do you want to talk to me and my boss about what's going on tonight?

Samuel: Right now?

Detective Wilhelm: Yeah. That's why we're here. Do you wanna talk?

Samuel: Like, where will I, where will I stay?

Detective Wilhelm: Just right here. We'll just chat right here.

Sergeant McCormick: Yeah, we're just gonna chat in this room.

Detective Wilhelm: No, we're not gonna keep you all night. We'll just chat right now. So, this is just – because you have, you have the right to talk to

me. Like I said, I have the right to talk to you, so this is just saying having these rights in mind do you want to talk to me right now?

Samuel: Right now?

Detective Wilhelm: Yeah.

Samuel: Like how much time will it take?

Detective Wilhelm: It won't take long.

Sergeant McCormick: Thirty minutes to an hour tops is what I imagine.

Detective Wilhelm: Yeah, I've got stuff to do, so. Do you want to chat?

Samuel: Sure.

Detective Wilhelm: Okay. Do you want to do that [sic] same? Do you want to circle yes for me? And then can you put the date?

Samuel: Yeah.

Sergeant McCormick: Lefty, man, I love it.

Detective Wilhelm: I know, and did you see how good I did? I-I kept my mouth shut while you were signing. Okay, so I'm gonna take this real quick, okay? And so I'm gonna sign the bottom.

*Samuel*, 452 P.3d at 782–83.

Meanwhile, the public defender for Kootenai County had arrived at the police station and demanded to see Samuel. *Id*. at 787. Officers denied that request. *Id*.

The interrogation lasted about four and a half hours, during which Samuel admitted to shooting his father and, after additional cajoling, to shooting and repeatedly stabbing his brother.

8

Samuel will provide additional facts relevant to the habeas claims in the

argument section.

## STANDARDS GOVERNING FEDERAL HABEAS REVIEW

This petition is governed by the Antiterrorism and Effective Death Penalty Act.

Under AEDPA, 28 U.S.C. § 2254(d), a habeas petitioner is not entitled to federal habeas

relief on a constitutional claim that the state court has adjudicated on the merits unless

that ruling:

1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established law if "the state court arrives at a

conclusion opposite to that reached by [the Supreme] Court on a question of law or if

the state court decides a case differently than [the Supreme] Court has on a set of

materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A

decision involves an "unreasonable application" of clearly established federal law if

"the state court identifies the correct governing legal principle … but unreasonably

applies that principle to the facts of the [petitioner's] case." *Id*.

Circuit precedent does not constitute "clearly established Federal law, as

determined by the Supreme Court," and cannot form the basis for habeas relief under

AEDPA. *Parker v. Matthews*, 567 U.S. 37, 48 (2012). But "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011).

If the petitioner can show that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, § 2254(d)(1), then the federal court is not constrained by the restrictions in AEDPA and may review the constitutional claim de novo. *Maxwell v. Roe*, 628 F.3d 486, 494-95 (9th Cir. 2010).

## CLEARLY ESTABLISHED FEDERAL LAW
## GOVERNING JUVENILE INTERROGATIONS

A persistent line of authority from the United States Supreme Court recognizes that "admissions and confessions of juveniles require special caution." *In re Gault*, 387 U.S. 1, 45 (1967). When "a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used." *Haley v. Ohio*, 332 U.S. 596, 599–600 (1948)(noting that "age 15 is a tender and difficult age for a boy of any race ... [and] he cannot be judged by the more exacting standards of maturity."). That is, "no matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject. *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962).

A.    The Fifth Amendment and *Miranda*

    1.    *Constitutional Warnings*

Any police interview of an individual suspected of a crime has "coercive aspects to it." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam). But because of the particularly coercive nature of *custodial* police interrogations, the Supreme Court long ago adopted warnings that officers must give to a suspect to safeguard the constitutional guarantee against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436 (1966).

Before police question an in-custody suspect, they must warn him that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. Although the Supreme Court has never required that interrogators use magic words, the warnings must still "adequately and effectively" advise suspects of their choice under the Fifth Amendment, meaning that the warnings must clearly inform suspects of their rights. *Id*., at 467; *see also Missouri v. Seibert*, 542 U.S. 600, 602 (finding warnings "ineffective" when they were read in the middle of a police interview); *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989) (noting that warnings must "reasonably convey" the suspect's rights).

*Miranda* is now a constitutional rule firmly woven into the privilege against self-incrimination in the Fifth Amendment. *Dickerson v. United States*, 530 U.S. 428, 438 (2000).

　　2.　　*Waiver*

There is a presumption against waiver of these rights. If a suspect makes a statement during custodial interrogation, the burden is on the prosecution to show that the defendant voluntarily, knowingly, and intelligently waived his rights. *Miranda*, 384 U.S., at 444, 475–476; *Dickerson*, 530 U.S., at 443–444.

A waiver is knowing and intelligent if it is made with a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

The test for reviewing a juvenile's purported waiver, like an adult's waiver, is based on the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). But, for a juvenile, those circumstances include an "evaluation of the juvenile's age, experience, education, background, and intelligence, and ... whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.*

　　B.　　<u>The Fourteenth Amendment's Voluntariness Requirement</u>

Even if a defendant has validly waived his or her rights under *Miranda*, any confession must still be voluntary. A criminal defendant is deprived of due process of

law under the Fourteenth Amendment if his conviction is founded on a confession that was the product of coercion, either physical or psychological, regardless of the truth or falsity of the confession. *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). This rule exists "not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle of our criminal law." *Id*. at 540-41 (citations omitted).

If the accused claims that her statements to law enforcement officers were involuntary, she has right to a determination by the court on that issue, *Jackson v. Denno*, 378 U.S. 368, 390- 91 (1964), and the State bears the burden to prove that a confession was voluntary by a preponderance of the evidence, *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Even non-custodial interrogations can, under the right set of facts, result in involuntary confessions. *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976).

The test for determining voluntariness is to examine the totality of the circumstances and to ask whether the defendant's will was overborne by police conduct. *Arizona v. Fulimante*, 499 U.S. 279, 287 (1991). A reviewing court must examine the characteristics of the accused and the details of the interrogation, including factors such as: (1) whether the defendant was *Mirandized*; (2) the age of the accused; (3) the accused's level of education; (4) the length of the detention; (5) whether the questioning was repeated and prolonged; and (6) deprivation of food or sleep. *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973).

As for juveniles, the Supreme Court has observed that "[t]he application of these principles involves close scrutiny of the facts of individual cases," and the young age of the accused is a "crucial factor." *Gallegos*, 370 U.S. at 52 (citing *Haley*, 332 U.S. at 599-600). An interrogation that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley*, 332 U.S. at 599.

This is so because "a child's age is far more than a chronological fact." *See J.D.B. v. North Carolina*, 564 U.S. 261, 272-73 (2011). In *J.D.B.*, the Court reaffirmed that "time and again," it has held that children are not miniature adults under the law; they are influenced by peer pressure, more impulsive than adults, less mature, and less able to withstand questioning from authority figures. *J.D.B.* 564 U.S. at 272 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 115-116 (1982)(holding that young age and a poor upbringing must be considered as mitigating circumstances at a capital sentencing); *Bellotti v. Baird*, 443 U.S. 622, 635 (1979) (noting that youth "are more vulnerable or susceptible to ... outside pressures" than adults); *Roper v. Simmons*, 543 U.S. 551, 569 (2005)(relying on the unique and transitory attributes of youth to find that the death penalty is unconstitutional for juvenile offenders).

## ARGUMENT

## I.

**The Idaho Supreme Court's decision that Eldon Samuel knowingly, voluntarily, and intelligently waived his Fifth Amendment rights before police interrogated him was based on an unreasonable determination of the facts and involved an unreasonable application of clearly established federal law.**

In turning aside Samuel's claim, the Idaho Supreme Court cited the correct constitutional totality of the circumstances test from *Fare v. Michael C*, 442 U.S. 707 (1979). *Samuel*, 452 P.3d at 786. Yet it applied that test in an objectively unreasonable manner to the facts at hand.

Nowhere in its opinion did it acknowledge the special caution that the United States Supreme Court has held must attend juvenile interrogations. It reached an unreasonable finding of fact and erroneously relied on state law to find that Detective Wilhelm's unclear statements contradicting Samuel's Fifth Amendment rights "were not fatal to Samuel's *Miranda* waiver." *Samuel*, 452 P.3d at 787. It ignored material facts that cut against a knowing and voluntary waiver. And it assessed certain other facts individually rather than weighing them cumulatively. *Id*. at 787-88.

Although the Idaho Supreme Court initially acknowledged that young age was a factor in its analysis, it wholly failed to apply youth in the way that the United States Supreme Court has held it should be applied. Youth puts an interpretive gloss over the

entire endeavor. That is so because the United States Supreme Court has held that, in the eyes of the law, children are less mature than adults and are more prone to influence and pressure from authority figures. *See, e.g., Gallegos*, 370 U.S. at 52.

The Idaho Supreme Court failed to connect Samuel's uniquely difficult upbringing with the totality of the circumstances surrounding the interrogation. While the court mentioned it in passing at the beginning of the opinion, it omitted those facts entirely from its legal analysis on this issue.

Samuel had not grown up in a typical, stable childhood home. His parents moved frequently, usually after they had failed to pay the rent. *Samuel*, 452 P.3d at 775. They were both addicted to drugs. *Id*. The family lived in squalid conditions, with cockroaches and vermin. *Id*. Samuel witnessed extreme violence in the home, including his father pouring lighter fluid on Samuel's mother and threatening to light her on fire. *Id*. On a different occasion, he pointed a gun at her head and forced Samuel to urinate on her. *Id*. Eventually, his mother and father split. Samuel moved with his father and autistic brother to Coeur d'Alene. *Id*. By then, his father was delusional, teaching Samuel that the zombie apocalypse was imminent and that they must prepare for a violent encounter. *Id*. His school attendance was sporadic, at best. He was behind in math and English. He was socially isolated.

It is not a stretch to say that Samuel had been primed by his upbringing to fear and obey adult authority figures like his father. And the actions of law enforcement fed

into that tendency. Before the interview began, Samuel had been in custody for nearly an hour. *Samuel*, 452 P.3d at 787. Officers exercised control over him and his body in a way that would make him feel vulnerable. They put him in a small interrogation room with at least three other adult male officers. *Id*. at 782. They stripped him naked and took photographs. *Id*. They swabbed him for evidence. *Id*. They did not give him underwear or socks. *Id*. It was clear who was fully in control.

Samuel was taking medication for mental health issues, and he was always in pain from various physical ailments. *Id*. at 775. He saw doctors frequently. *Id*. He had slept only a few hours the previous night and had not eaten for about 12 hours. *Id*.

Then, in a coercive push and pull of law enforcement tactics, a purportedly friendly face was introduced into the mix. Detective Wilhelm was the school resource officer at Samuel's middle school. Sergeant McCormick intentionally chose Wilhelm as the lead interviewer because he was known to Samuel, who had never been in trouble with the law before. But Wilhelm's job was not to help Samuel; it was to extract a confession from him. Wilhelm played on his status as Samuel's school resource officer. He displayed a jocular and friendly disposition.

Wilhelm gave Samuel a copy of a *Miranda* waiver form and tried to interpret it verbally for Samuel, downplaying Samuel's rights and mangling them badly in the process.

He told Samuel that "we didn't go over these in the office" – meaning when they had met before in his office at the school – but "99% of the kiddos in my office we give them this warning because sometimes we talk to parents about what we're gonna talk about and sometimes we won't." *Samuel*, 452 P.3d at 782. This confusing introduction suggested that the rights were just routine ("99% of the kiddos") and even implied that the form was necessary when officers might want to speak with a kid without telling his or her parents, or something along those lines. He then explained that the form was a "*Miranda* warning," but that it was not like television shows where "sometimes they slam up against the car, put them in jail, read them their rights. And so that's not anything like that." *Id*. Again, he was implying that Samuel's situation was not anywhere near that grave. And if there were any ambiguity about that, Wilhelm followed up that"[t]hese are just some rights that everyone is entitled to." *Id*.

Wilhelm then read the form out loud and asked Samuel if he understood. Samuel nodded. Wilhelm asked him to sign, but while Samuel was trying to do that, Wilhelm distracted him by saying "I didn't know you were a lefty?" Samuel didn't seem to understand and responded, "a lefty?" 452 P.3d at 783. Because of Wilhelm's comment, he made a mistake signing and dating the form. *Id*.

Samuel's responses after he signed further prove that he did not understand the nature of the rights he would be giving up. When Wilhelm asked him if he wanted to talk to him and "his boss" about "what's going on tonight," he said, "right now?" 452

P.3d at 783. When Wilhelm told him, "that's why we're here. Do you wanna talk?" *Id*. Samuel asked, "like, where will I, where will I stay?" *Id*.

When Wilhelm tried to clarify things, he only made them worse. He told Samuel "[s]o, this is just – because you have, you have the right to talk to me. Like I said, I have the right to talk to you, so this is just saying having these rights in mind do you want to talk to me right now?" 452 P.3d at 783.  In this critical statement, Wilhelm turned the Fifth Amendment on its head. He, of course, had *no right at all* to speak to Samuel absent Samuel's waiver of his privilege against self-incrimination, and Samuel's right was one to be *silent*, not a right to *speak* to the officer.

The Idaho Supreme Court brushed aside Detective Wilhelm's statements as "perhaps too casual." *Samuel*, 452 P.3d at 787. They were much worse than that. They were affirmative misstatements of the law.

* * *

No fairminded jurist could agree that these circumstances, when assessed and weighed cumulatively, demonstrated that Eldon Samuel understood the nature of the rights that he had or that he knowingly, intelligently, and voluntarily gave up those rights.

For support, this Court should look no further than *Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011), a post-AEDPA en banc decision from the Ninth Circuit.

In *Doody*, police interviewed a 17-year-old boy about the murder of nine people in a Buddhist temple. Two police officers questioned him, beginning at 9:25 p.m. and extending into the overnight hours, in a small interview room. 649 F.3d at 991. They gave the boy a standard and relatively uncomplicated form that set out his rights. *Id*. But, like here, one detective then went on a frolic and detour when he attempted to explain what those rights meant. He portrayed them as a mere formality: "we read these to people on somewhat of a regular basis." *Id*. at 991. He said that Doody should not "take them out of context." *Id*. at 1002. He said that the right to counsel did "not necessarily mean that you were involved, but if you were, then that's what that would apply to okay." *Id*. at 992. And he suggested that the rights were "mutually beneficial." *Id*. at 1005.

*Doody* is similar to this case in all material respects. As in *Doody*, two officers interrogated Samuel, a juvenile, in a small interview room beginning in the late evening and running into the overnight hours. Like *Doody*, here Detective Wilhelm depicted Samuel's Fifth Amendment rights as a mere formality ("99% of the kiddos in my office we give them this warning;" "it's not anything like [a t.v. show];" "these are just some rights everyone is entitled to"). Also like *Doody*, Wilhelm falsely indicated that the rights were mutually beneficial ("you have the right to talk to me. Like I said, I have the right to talk to you ...").

The most pertinent similarity is that in both cases the state courts unreasonably applied controlling federal law that demands that *Miranda* warnings be *adequate* and *effective*, meaning that officers must *clearly inform* the suspect of the nature of his or her rights. *See Doody*, 649 F.3d at 1003 (quoting *Miranda*, 384 U.S. at 471-72 ("[An individual held for interrogation must be *clearly informed*" of his rights) (emphasis added in *Doody*)). The Ninth Circuit wrote that the warnings in *Doody* "were defective because Detective Riley downplayed the warnings' significance, deviated from an accurate reading of the *Miranda* waiver form, and expressly misinformed Doody regarding his right to counsel." *Id*. If one substitutes "right to counsel" with "right to silence," that would describe Samuel's situation precisely.

There are some differences between *Doody* and the present case, but they are not material. In *Doody*, the detective's explication of what *Miranda* warnings meant went on for 12 pages of transcript. Here, Detective Wilhelm's explanation covers fewer pages. But the important point is the confusion that both detectives injected into otherwise straightforward waiver forms. Some differences cut in Samuel's favor. Doody was almost an adult; Samuel was barely a teenager. Samuel had a much different upbringing, and, unlike Doody, he was familiar with Detective Wilhelm, who was falsely offered as a trusted source when he was in an adversarial role.

In *Doody*, the state court's conclusion that the detective's warnings were "clear and understandable" amounted both to an unreasonable determination of the facts

(they were unclear) and to an unreasonable application of clearly established federal law (*Miranda* and its progeny demand clarity). *Id*., citing *Seibert*, 542 U.S. at 608. That is equally true here. The Idaho Supreme Court's finding that Detective Wilhelm's warnings were "inartful" but not "fatal" was an unreasonable determination of the facts in light of the evidence presented, which established that his jumbled warnings were more than "inartful;" they were inadequate, unclear, and ineffective. And the Idaho Supreme Court's conclusion that the State had carried its burden to prove that Samuel knowingly, intelligently, and voluntarily waived his rights in the face of confusing and contradictory *Miranda* warnings involved an unreasonable application of clearly established federal law.

## II.

**The Idaho Supreme Court's decision that Eldon Samuel voluntarily made incriminating statements during his custodial interrogation was based on an unreasonable determination of the facts and involved an unreasonable application of clearly established federal law.**

The Idaho Supreme Court concluded, independent of the *Miranda* issue, that Samuel's statements were voluntary and free from any coercion or compulsion. This, also, involved an unreasonable application of clearly established federal law and was based on unreasonable findings of fact.

The test for determining voluntariness is to examine the totality of the circumstances and to ask whether the defendant's will was overborne by police conduct. *Arizona v. Fulimante*, 499 U.S. 279, 287 (1991). A reviewing court must examine the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamante*, 412 U.S. 218, 226 (1973). "The application of these principles involves close scrutiny of the facts of individual cases," and the young age of the accused is a "crucial factor." *Gallegos*, 370 U.S. at 52 (citing *Haley*, 332 U.S. at 599-600).

In this section of the state court's opinion, it did not cite any of the landmark Supreme Court cases holding that a reviewing court must exercise special caution when assessing the voluntariness of a juvenile's confession. While the state court acknowledged that aspects of Samuel's education and background were relevant, its analysis reveals that it was, at best, attempting to compare those factors with other youths of a similar age rather than comparing them to the *maturity and capacity of an adult* who faces a police interrogation. It noted that Samuel "was able to work independently on schoolwork and had no trouble communicating." *Samuel*, 452 P.3d at 788. It wrote that "Samuel was at least of average intelligence, particularly for written and oral communication." *Id*. Nowhere did the Idaho Supreme Court identify the traits of children that United States Supreme Court has repeatedly emphasized make them more vulnerable as a class, including their immaturity, susceptibility to influence and coercion, impulsiveness, and disadvantages in dealing with the police or authority

figures. *See, e.g., J.D.B*, 564 U.S. at 274 (collecting cases); *see also Miller v. Alabama*, 567 U.S. 460, 477-78 (2012) (defining "the incompetencies associated with youth" as including an "inability to deal with police officers or prosecutors ..."); *Graham v. Florida*, 560 U.S. 48, 78 ("[T]he features that distinguish juveniles from adults also put them at a significant disadvantage in criminal proceedings.").

Nor did the Idaho Supreme Court consider Samuel's own background that went well beyond the types of challenges that a child in the criminal justice system might have endured. Although he may have been of "average intelligence" and had "no trouble communicating," he had lived a peripatetic young life filled with violence, neglect, and despair. He had moved dozens of times. He was absent nearly half of the brief part of the school year that he was enrolled in middle school, and he was failing his classes. His father had been a controlling and dominant figure for him, inculcating in him a belief in zombies. Whatever disadvantages a typical 14-year-old might have when facing police officers, Eldon Samuel had them in spades.

The state court dismissed the absence of a parental figure or other "friendly adult" as a factor because "Samuel's father had been killed earlier that evening, and the officers did not know how or where to contact Samuel's mother during the interrogation." 452 P.3d at 787. But the import of this factor is not whether a friendly adult was readily available; it is that the *absence* of an adult in the child's corner makes involuntariness more likely. In any case, the officers did not try to find Samuel's mother,

despite him expressly telling them that he wanted to speak with her. (PSI, pp. 2476-78.) Indeed, they flipped the "friendly adult" script and portrayed Detective Wilhelm as a trusting source on his side, when nothing could be further from the truth. Moreover, the Kootenai County Public Defender was at the police station demanding to see Samuel, but officers turned him away. The Idaho Supreme Court oddly brushed this aside because there was no "prior attorney-client relationship," 452 P.3d at 768, but it hardly follows that the Public Defender would not have been a "supportive adult in Samuel's life" for purposes of the police interview.

The Idaho Supreme Court also made an unreasonable finding of fact, for the reasons discussed in the previous section, when it determined that Samuel had affirmatively understood and waived his *Miranda* rights. *Samuel*, 452 P.3d at 789.

The Idaho Supreme Court compounded its errors by dividing and conquering the selective facts that it did consider, rather than marshalling and weighing all the circumstances together. It checked off the alleged *Miranda* waiver (incorrectly), noted Samuel's supposed average intelligence and communication skills, and then finished by writing that Samuel's interrogation lasted five hours but he was given bathroom breaks, water, and was offered food about halfway through. *Samuel*, 452 P.3d at 789. A seriatim analysis of this sort runs afoul of clearly established federal law. The answer to the voluntariness question instead "depends on a weighing of the circumstances of the pressure against the power of the resistance of the person confessing." *Dickerson*, 530

U.S. at 434; *see also Reck v. Pate*, 367 U.S. 433, 440 (1961) (holding that all attendant circumstances must be taken into account). That law required the Idaho Supreme Court to *combine* the factors, rather than divide them, and then weigh them together to decide whether Samuel's statements were a product of his own free will.

*Doody* is again instructive. There, the Ninth Circuit concluded that the state court had unreasonably resolved a voluntariness issue. The Court faulted the Arizona Court of Appeals for not sufficiently crediting Doody's status as a juvenile as being of "critical importance." 649 F.3d at 1008. It chastised the state court for "ticking off the list of circumstances rather than considering them in their totality." *Id*. at 1011. And it found that the officers' repeated inquiries to Doody for many hours weighed heavily on the side of coercion. *Id*.

The present case is similar. The Idaho Supreme Court noted Samuel's tender age but did not give it any special weight. It ticked off the circumstances of the interrogation individually rather than assessing the cumulative weight of those factors. And though it noted that for the first two hours the officers did not press Samuel hard, *see* 452 P.3d at 788, it overlooked that when they turned to inquire about the death of Samuel's brother – perhaps the most prejudicial part of the confession – they applied significant pressure. They challenged his story repeatedly, telling him "there is no way that really happened." *Id*. at 788. Wilhelm exhorted him to "just tell me." *Id*. The officers told him

he would feel better and that it would "help him" to confess. *Id*. at 788-89. Wilhelm said, "no more crap, and no more leaving out details." *Id*.

As in *Doody*, then, this Court should conclude that the Idaho Supreme Court's adjudication of this claim was based on an unreasonable determination of the facts and involved an unreasonable application of clearly established federal law.

## CONCLUSION

Eldon Samuel respectfully requests that this Court grant him a conditional writ and order that Respondent release him from custody unless the State corrects the constitutional error within a reasonable time.

Respectfully submitted on this 27th day of December, 2021.


/s/Craig H. Durham

Attorney for Petitioner

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 27th day of December, 2021, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Mark Olson
Mark.Olson@ag.idaho.gov

Attorney for Respondent.

/s/Craig H. Durham
Attorney for David Johnson